UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARCOLYN KARPAN, | ) | CASE NO. 1:14CV2227 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | Report and Recommendation of |
| ACTING COMMISSIONER OF | ) | Magistrate Judge |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Marcolyn Karpan ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court affirm the Commissioner's decision and dismiss Plaintiff's complaint with prejudice:

I.    **PROCEDURAL AND FACTUAL HISTORY**

On December 18, 2009, Plaintiff applied for SSI alleging disability beginning February 1, 2009 due to fibromyalgia, a broken neck, cerebral artery damage and open skull fracture, multiple broken ribs and depression.  ECF Dkt. #13 ("Tr.") at 216-217, 244.  On April 16, 2010, Plaintiff applied for Disability Insurance Benefits ("DIB") alleging disability beginning February 1, 2009. Id. at 220.  The SSA denied Plaintiff's applications initially and on reconsideration.  Id. at 98-101, 131, 149-158. Plaintiff took no further action on these denials.

On September 7, 2011, Plaintiff  applied for SSI, alleging disability beginning November 18, 2009 due to fibromyalgia and a broken neck.  Tr. at 227, 292.  The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 102-117, 159-164, 169-176. Plaintiff requested an administrative hearing, which was held on February 21, 2013. Tr. at 30, 177. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and he also accepted the

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

testimony of a medical expert ("ME") and a vocational expert ("VE"). *Id.* at 30. On May 13, 2013, the ALJ issued a Decision denying benefits. Tr. at 10-23. Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on August 14, 2014. *Id*. at 1-3, 6.

On October 7, 2014, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On January 13, 2015, Plaintiff filed a brief on the merits. ECF Dkt. #15. On April 6, 2015, Defendant filed a brief on the merits. ECF Dkt. #18. A reply brief was filed on April 20, 2015. ECF Dkt. #19.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ noted Plaintiff's prior applications and her failure to request an ALJ hearing which resulted in those determinations becoming administratively final. Tr. at 15. However, the ALJ found that because Plaintiff's current application alleged disability during a period previously adjudicated, the current application implied a request to reopen the prior claim, so long as good cause in the form of new and material evidence existed for reopening the prior claim. *Id*. The ALJ reviewed the requirement of establishing new and material evidence and found that the record failed to show that the prior determination was incorrect and the current record in fact showed that Plaintiff was not disabled. *Id.* at 16.

The ALJ thereafter found that Plaintiff suffered osteoarthritis in both hips and the right knee, cervical spondylosis, and depression, which qualified as severe impairments under 20 C.F.R. § 416.920(c). Tr. at 13. The ALJ concluded that Plaintiff also suffered from the non-severe impairments of carpal tunnel syndrome ("CTS") and fibromyalgia. *Id.* Next, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.920(d), 416.925 and 416.926 ("Listings"). *Id.* at 14-16.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. 416.967(b) but with the following limitations: she can only occasionally stoop, kneel or crouch; she can never crawl or climb ladders, ropes, or scaffolds; she cannot work around unprotected heights and she could perform only routine, low-stress work without intense interpersonal interactions which he defined as work not involving arbitration,

confrontation, negotiation, supervision of others, being responsible for the health or safety of others, and no high or strict production quotas.  Tr. at 16.  The ALJ ultimately concluded that, although Plaintiff could not perform her past work as a real estate investor, server or veterinarian's assistant, she was able to perform a number of jobs existing in significant numbers in the national economy, including the representative occupations of housekeeping cleaner, mail clerk, and file clerk.  *Id.* at 22-23.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to social security benefits.

**III.**     **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope

by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.**     **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

         **A.**     **Medical evidence**

                **1.**     **CTS/Hand impairments and other relevant medical records**

As Defendant points out, Plaintiff's assertions of error before this Court concern only her CTS/hand impairments and her depression. ECF Dkt. #15 at 2; ECF Dkt. #18 at 3; ECF Dkt. #19. Accordingly, the undersigned's review of the medical evidence is limited to those impairments.

On August 16, 2009, Plaintiff presented to the emergency room stating that a 150-pound statue fell on her head and she had a frontal headache radiating to her eyes. Tr. at 503-504. A neck and head CT showed no acute injury except for cephalohematoma. *Id.* at 505. The doctor repaired

the laceration to her scalp with one staple and she was given Morphine and Percocet and discharged the following day.  *Id*. at 505-506.

On November 19, 2009, Plaintiff was involved in a motor vehicle accident and suffered a fracture of her cervical vertebra, an open skull fracture, cervical strain, a vertebral artery occlusion without an infarction, and a closed fracture of multiple ribs.  Tr. at 742-745.  She was hospitalized from November 19, 2009 through November 23, 2009 and discharged with no restrictions except that she had to wear a C-collar at all times and had to follow up in the neurosurgery clinic and in the trauma clinic within two weeks.  *Id*. at 499-501.  She was also evaluated for her depression during her stay and no new medications were recommended.  *Id.* at 501.

A January 11, 2010 head CT showed a mildly depressed healing right temporal fracture with no acute hemorrhage and no significant change since December 14, 2009.  Tr. at 452.

A January 13, 2010 cervical spine MRI showed multilevel degenerative changes most notably mild disc bulge at C5-C6 and C6-C7 without cord compression, but no epidural hematoma, cord contusion or extruded disc.  Tr. at 451.  The MRI showed findings consistent with the known C2 fracture.  *Id.*

On January 20, 2010, Plaintiff reported to Dr. Anderson, a neurosurgeon who followed up with her for her cervical fracture, that she was still having tingling in her arms.  Tr. at 597.  A MRI showed no disc herniations, other than the same bulges, and it showed that the alignment of the C2 fracture was perfect.  *Id*.  Dr. Anderson decided to keep Plaintiff in the cervical collar for another month and then get a CT.  *Id*.  He noted that the MRI showed that Plaintiff was developing some callus at the site of the fracture which he believed indicated healing.  *Id.*  Plaintiff asked him for a referral to counseling as her biggest concern was losing her independence and livelihood with her injury.  *Id.*  He referred her for counseling.  *Id*.

On February 24, 2010, Plaintiff presented to Drs. Onwuzulike and Dr. Anderson in the neurosurgery department for follow-up of her C2 fracture.  Tr. at 585.  A cervical spine x-ray taken that day was compared to the August 16, 2009 x-ray and it showed no signs of interval healing of the C2 fractures and slight anterior subluxation of C2 with respect to C3, which was not seen previously.  Tr. at 449, 607.

On March 15, 2010, Plaintiff presented to MetroHealth after she had an gynecological appointment at the hospital and tripped on a step and injured her ankle. Tr. at 523. She denied neck or back pain and she had no arm pain or tingling or numbness. *Id*. at 523-524. She was diagnosed with a right ankle sprain and a right rib contusion. *Id*. at 525.

On June 8, 2010, agency reviewing physician Dr. Heck found that Plaintiff's skull fracture was a non-severe impairment for disability purposes because it was managed conservatively and healed well according to medical records. Tr. at 530.

On June 11, 2010, agency reviewing physician Dr. Quinlan opined that Plaintiff's fibromyalgia was a non-determinable impairment because while back pain was recurrent in her medical records, it was never really addressed medically, only hypothesized to be a diagnosis, and not otherwise mentioned or treated. Tr. at 532. Dr. Quinlan also noted that no limitations in Plaintiff's daily living activities were ever mentioned resulting from such a diagnosis. *Id*.

On June 15, 2010, Dr. Gupta reviewed Plaintiff's medical records for the agency and noted that Plaintiff's C2 fracture was treated conservatively, no neurological deficits were noted, normal reflexes and motor and sensory findings were found, and x-rays showed good alignment. Tr. at 534. He opined that the fracture would heal in 12 months and such an impairment was not expected to last more than 12 months. *Id*. As to Plaintiff's rib fractures, Dr. Gupta noted no neurological deficits, no pulmonary or cardiac contusions, and the x-rays showed that the fracture sites were not well appreciated. *Id.* He opined that the rib fractures would heal within 12 months and would not be expected to last more than 12 months. *Id*. As to Plaintiff's back impairment, Dr. Gupta noted that Plaintiff was treated in 2007 and 2008 for it and her gait was found to be normal, her neurological examination was normal and her x-rays were normal. *Id*. He opined that Plaintiff's neck, ribs, back and ankle impairments were not severe and not severe in combination. *Id*. at 535.

On June 23, 2010, Plaintiff presented to Dr. Minwell, a neurosurgeon, for consultation as to her musculoskeletal complaints status post her motor vehicle accident, including neck pain radiating down her spine, right-sided jaw pain, right arm pain down her forearm and left radicular leg pain. Tr. at 563. Upon neurological examination, he noted paresthesia and sensory dysfunction of the right arm down to the forearm. *Id*. at 564. His examination of her upper and lower extremities

-6-

showed full strength and her hand intrinsics also showed full strength.  *Id.* The sensory examination and Plaintiff's reflexes were also normal.  *Id*.  He indicated that X-rays taken that day showed a healed C2 and skull fracture and he opined that she appeared to meet the DSM-IV criteria for somatization disorder.  *Id.* at 565.  The cervical CT scan showed significant progression and healing of the C2 fracture since the last CT scan and subluxation of C2 on C3 which was stable.  *Id*. at 599.

Dr. Minwell opined that Plaintiff had so many complaints that it was impossible to determine where they were coming from and he thought that she had either a pain syndrome or "something that is related to her desire for disability."  Tr. at 565.  He noted that Plaintiff had an appointment at the pain clinic coming up and he was also going to send her to physical medicine and rehabilitation for a disability evaluation.  *Id.*  He saw no need for a follow up with neurosurgery.  *Id*.

On July 16, 2010, Plaintiff presented to Dr. Aguilera in the pain management clinic at The MetroHealth System for her complaints of chronic neck pain, right jaw pain, right arm pain down her forearm and left radicular leg pain.  Tr. at 558.  Her motor vehicle accident injuries were noted, as well as the CT spine x-rays from February of 2010 which were interpreted as showing significant progression and healing of the fracture although complete bony union had not occurred.  *Id.*  It was also noted that the subluxation previously identified was stable in appearance.  *Id*.  Clinical examination showed tenderness on the rhomboids, at the right first rib and on the right lateral epicondyle.  *Id*. at 560.  Her muscle strength and sensation was normal on both upper extremity muscles and she had intact sensation as well.  *Id.*  Diagnoses included chronic neck pain with history of C2 fracture treated non-operatively, right temporal fracture history, right C6 fracture, and a present examination consistent with myofascial pain syndrome.  *Id.*  Plaintiff was prescribed Naproxen, Neurontin, Flexeril, physical therapy, a TENS unit and told to consider trigger point injections.  *Id.*

On October 20, 2010, Dr. Stock reviewed Plaintiff's medical records and affirmed the initial disability denial as he found no worsening of Plaintiff's physical conditions.  Tr. at 616.

Beginning in 2011, Plaintiff treated with a chiropractor for her severe constant neck pain, severe constant migraines and severe stabbing mid back pain.  Tr. at 617.  Dr. Lubrani, the chiropractor, found on April 14, 2011 that Plaintiff had palpations and muscle spasms in her lumbar,

thoracic and cervical spines, and reduced flexion and rotation.  *Id*. at 621.  He noted that Plaintiff noted her longstanding complaints with little resolution of these problems despite seeing a number of doctors.  *Id*.  He noted that "[f]or no obvious reason, the patient complained about constant neck pain, frequent migraine headaches and stabbing pain in the mid back."  *Id*.  He recommended chiropractic manipulative therapy.  *Id.* at 622.

After one manipulation, Dr. Lubrani noted that Plaintiff's condition was improving slower than anticipated, but he believed that conservative chiropractic treatment should be continued because the overall assessment of the condition was improving and Plaintiff was feeling a little better.  Tr. at 623.  X-rays ordered by Dr. Lubrani on April 15, 2011 showed a normal thoracic spine, a normal lumbar spine, and a cervical x-ray showing only narrowing of the interspace at C5-C6.  *Id.* at 632-634.  Plaintiff received chiropractic treatment three times per week throughout April and May of 2011.  *Id*. at 632.

A May 18, 2011 MRI of Plaintiff's cervical spine showed normal C2-C3, and widely patent thecal sac and neural foramina at C3-C4, C4-C5, and C7-T1, with no cord compression or displacement of the exiting nerve root.  Tr. at 635.  The cervical MRI also showed central disc herniations at C5-C6 and C6-C7 without facet hypertrophy, cord compression, canal stenosis or foramen compromise, but straightening of the normal cervical lordosis.  *Id*. at 635-636.

Plaintiff treated with Dr. Parshotam Gupta of NeuroSpine Care, Inc. on a monthly basis from 2011 through 2012 for her complaints of neck pain giving her a headache and going into her lower back and into the right arm to the elbow.  Tr. at 645-655. She complained of a deep sharp chronic pain and had not fallen or injured herself and she indicated that repetitive movement increased the pain.  *Id*.  She explained that she had been through physical therapy and had been to a chiropractor.  *Id*. at 655.  Dr. Gupta noted on May 25, 2011 that Plaintiff was depressed, she had normal strength and reflexes in her upper and lower extremities, mild tenderness in the occipital area on the left side, well-preserved and pain-free range of motion, an aligned cervical and lumbar spine with normal curvatures, some tenderness in the left sacroiliac joint, and negative straight-leg raising.  *Id*. He diagnosed head injury with a C2 fracture, headache, left sacroiliac joint arthropathy, right knee pain, maybe osteoarthritis, fracture of the T11-T12 ribs, and generalized pain.  *Id.* at 656.  He prescribed

-8-

Soma, Tramadol, Ibuprofen 800 mg, restarting of Aspirin, ordered x-rays of Plaintiff's thoracic spine, advised Plaintiff to stay active, and administered a left sacroiliac joint block.  *Id*.

June 7, 2011 notes from Dr. Gupta indicate that Plaintiff reported that she had no pain in her left sacroiliac joint following the injection from May 25, 2011.  Tr. at 653.  However, she reported that she went to the emergency room with thoracic pain and neck pain and they gave her medications and discharged her.  *Id*.  Dr. Gupta obtained the results of the thoracic x-ray he ordered that  showed very minimal arthritis which did not explain the level of pain that Plaintiff was reporting.  *Id*.  Physical examination showed no muscle spasm in the cervical or thoracic spine, mild tenderness in the lower part of the cervical spine and in the midline of the lumbar spine, well-preserved range of motion, normal strength, and normal reflexes in the upper and lower extremities.  *Id*.  He diagnosed left sacroiliac joint arthropathy, improved after the injection, cervical spondylosis, and thoracic spondylosis of a mild nature.  *Id*.  He prescribed Ultram, Soma, and Ibuprofen 800 mg.  *Id*.  He surmised that "[a]t this point, I do not think there is any immediate type of problem, considering her thoracic x-rays." *Id.*

June 20, 2011 notes from Dr. Gupta indicate that Plaintiff returned indicating that the trigger block injection lasted for two weeks, but now she had pain all over her body and had several muscle spasms.  Tr. at 651.  Examination revealed trapezius muscle tenderness and muscle spasm, well-preserved range of motion, normal strength and reflexes, negative straight leg raising and some tenderness of the sacroiliac joint.  *Id*.  Dr. Gupta diagnosed bilateral sacroiliac joint arthropathy and cervical spondylosis, and he prescribed physical therapy, a physical evaluation for a job, Vicodin, Ibuprofen 800 mg, and Soma.  *Id.*

On July 5, 2011, Plaintiff's physical therapist at NeurospineCare, Inc., Mr. Dusenbury, wrote a letter indicating that he was treating Plaintiff for chronic neck and mid-back pain sustained from the 2009 auto accident.  Tr. at 738.  He indicated that in his professional opinion, Plaintiff could not tolerate even light sedentary work and was completely disabled.  *Id*.

On July 27, 2011, Dr. Gupta examined Plaintiff for her neck pain and muscle spasms in her lower back.  Tr. at 649.  Physical examination revealed that Plaintiff was depressed, she had no muscle spasms, but a tenderness on the left side of her sacroiliac joint, right occipital tenderness, and

bilateral trapezius muscle tenderness, but normal strength and reflexes, negative straight leg raising, and pain-free range of motion except for bilateral flexion of the trapezius muscle. *Id*. He diagnosed right occipital neuropathy with headache, cervical spondylosis, and left sacroiliac joint arthropathy. *Id*. He prescribed Vicodin, Soma, and Ultram. *Id*.

On August 29, 2011, Plaintiff presented to Dr. Gupta for neck pain going into both shoulders. Tr. at 647. Physical examination revealed that Plaintiff was depressed, she had no muscle spasms, but a tenderness in the lower part of her lumbar spine and cervical spine, with decreased ranges of motion, but normal reflexes and strength and negative straight leg raising. *Id*. He diagnosed right occipital neuralgia, headache, cervical spondylosis and left sacroiliac joint arthropathy. *Id*. He prescribed Ultram and Soma, but did not prescribe narcotics because Plaintiff tested positive for marijuana. *Id.* Dr. Gupta made the same diagnoses, along with sleep deprivation, on September 9, 2011 and prescribed Ultram, Soma and Trazadone for Plaintiff for her neck and lower back pain complaints. Tr. at 645.

On October 9, 2011, Plaintiff presented to the emergency room after being assaulted by her ex-husband or ex-boyfriend the night prior as he had pushed her down three steps. Tr. at 722. She complained of neck pain, right heel pain and an abrasion to her right hip. *Id*. Physical examination showed that Plaintiff had a normal gait, normal strength and muscle tone, and a full range of motion. *Id*. at 723-724.

A cervical spine x-ray showed a slight anterolisthesis of C2 on C3 within normal limits, no fracture, and moderate degenerative spurring C5-C6. *Id*. at 725. A cervical spine CT showed no evidence of fracture, straightening of the normal cervical lordosis, suggestive of muscular spasm, left-sided torticollis, mild anterior subluxation of C2 on C3 with posterior spurring relating to degenerative changes, degenerative changes, and soft tissue swelling behind the right sternocleidomastoid muscle, relating to Plaintiff's trauma. *Id.* at 726. Plaintiff was discharged with diagnoses of hip and ankle abrasions and cervical strain and was instructed to continue taking Ultram and her muscle relaxant. *Id.* at 729.

On October 11, 2011, Plaintiff presented to Dr. Patel at the Neurology Center at the referral of Dr. Onyeneke for her CTS and cervicalgia. Tr. at 781-782. She reported terrible muscle spasms

-10-

in her back and neck and an inability to sleep due to the pain.  *Id.*  Upon examination, Dr. Patel noted multiple tender points, normal upper extremity strength, a normal gait and a normal stance. *Id*. at 782-783.  He diagnosed cervicalgia and CTS and indicated that Plaintiff would require pain management.  *Id*. at 783.  He noted Plaintiff's mild CTS on the right from the EMG and straightening of the spine but no suggestion of spasmodic torticollis.  *Id*.  He indicated that he did not agree with the amount of Soma that Plaintiff was taking per prescription and he would not prescribe that for her, but he prescribed Lyrica.  *Id*.

Dr. Patel wrote a letter to Dr. Onyeneke indicating that he found significant tightness of the neck muscles upon examination with difficulty turning the neck, but no dystonic tremor and straightening of the spine.  Tr. at 786.  He also noted significant tenderness in the trapezius muscle and splenius capitis muscle.  *Id*.  He found normal upper extremity strength and normal sensation. *Id.*  He diagnosed Plaintiff with cervicalgia with cervicogenic pain.  *Id*. at 787.  He indicated that Plaintiff had loss of cervical curvature but had no spasmodic torticollis.  *Id*.

On November 3, 2011, Dr. Patel performed an EMG which showed mild right median nerve neuropathy at the wrist as seen in CTS and minimal borderline left median nerve neuropathy at the wrist as seen in CTS.  Tr. at 715.  Plaintiff also had a carotid duplex test which showed a degree of stenosis that was not hemodynamically significant.  *Id.* at 717-718.

On November 17, 2011, Plaintiff presented to Dr. Abraham in the Pain Clinic at the Cleveland Clinic for her migraines and back and neck pain.  Tr. at 681.  Dr. Abraham indicated that he did not have Plaintiff's past records relating to her auto accident and he could not access the entirety of a MRI of her cervical spine, except a part that showed evidence of degenerative disc disease ("DDD") with some tenting of the thecal sac.  *Id*. at 681-682.  Upon examination, Dr. Abraham found that Plaintiff had an appropriate affect and mood, normal and symmetric bilateral upper and lower extremity strength with no atrophy or tone abnormalities, and positive pain to palpation over the cervical paraspinal muscles and with neck flexion, extension and rotation.  *Id*. at 683.  She had full rotation of her neck and a normal cervical lordotic curve and full flexion and extension of her cervical spine.  *Id.*  He also found negative straight leg raising and positive pain to palpation of Plaintiff's lumbar paraspinal muscles.  *Id*.  Her gait was also antalgic.  *Id*. at 684.  Dr.

-11-

Abraham diagnosed cervical facet arthropathy, neck pain and myalgia and he prescribed a chronic pain rehabilitation program and Neurontin. *Id*.

On November 22, 2011, Plaintiff presented to Dr. Gupta for follow up of her CTS and cervicalgia. Tr. at 781. She reported terrible muscle spasms in her back and neck and trouble sleeping as a result. *Id*. She said that she had trouble urinating and her right leg gave out eight times last week. *Id*. He noted that an EMG showed consistency with CTS and the needle electrode examination was normal, as well as carotid ultrasounds. *Id*. Upon examination, Plaintiff's upper extremities were normal and her gait and stance were normal as well. *Id*. at 782. She was diagnosed with cervicalgia and CTS and pain management was recommended. *Id*. at 783. Dr. Patel noted that Plaintiff was taking a large dose of Soma and he did not agree with the amount that she was taking and was not able to prescribe it at that rate. *Id*. He started her on Lyrica. *Id*.

On December 5, 2011, Plaintiff presented to Dr. Gupta for complaints of neck pain going down to between her shoulder blades and non-radiating lower back pain. Tr. at 761. Dr. Gupta noted no signs of depression and found upon examination that Plaintiff had no muscle spasm but tenderness in the lower lumbar spine, with normal range of motion, flexion and extension. *Id*. He further found negative straight leg raising and mild tenderness in the cervical spine, right trapezius and right occiput. *Id*. He diagnosed right occipital neuropathy, bilateral sacroiliac joint arthropathy, cervical spondylosis and lumbar spondylosis. *Id*. He prescribed Ultram, Soma and Trazadone. *Id*.

On February 3, 2012, Plaintiff presented to Dr. Gupta complaining of bilateral hip pain, neck pain, and right knee pain after she fell and hit her left side against a bar. Tr. at 757. He noted that Plaintiff showed no signs of depression. *Id*. He found that Plaintiff had no muscle spasm in her neck but tenderness in her bilateral greater trochanter with well preserved range of motion, normal strength and reflexes, and a tender right knee. *Id*. He diagnosed sleep deprivation, recent injury, right knee arthritis, bilateral greater trochanter bursitis, and mild cervical spondylosis. *Id*. He ordered an x-ray of the right knee, injected the greater trochanter bursa, and prescribed Ultram, Soma and Trazadone. *Id*. The knee x-ray showed very mild patellofemoral joint space loss. *Id*. at 764, 766.     On February 12, 2012, Plaintiff presented to the emergency room complaining of a migraine, abdominal pain, arthritic pain, and shooting pains from a vein inside of her right leg. Tr.

at 691.  She explained that the pains had worsened over the last two weeks.  *Id.*  Physical examination showed no tenderness in the musculoskeletal system and normal range of motion, no neurological abnormalities, but her abdomen was tender to palpation.  *Id*. at 695.  A sonogram of the right lower extremity showed no deep vein thrombosis and a CT of Plaintiff's pelvis and abdomen showed no abnormalities.  *Id*. at 697-700.  She was diagnosed with abdominal pain, right leg pain, and a headache, and given medication.  *Id*. at 704.

On February 21, 2012, Plaintiff had another CT of her abdomen and pelvis for her abdominal pain with nausea and diarrhea.  Tr. at 713.  No abnormalities were found.  *Id*. Another sonogram of the right lower extremity also yielded no evidence of right lower extremity deep vein thrombosis.  *Id.* at 714.

On February 29, 2012, Plaintiff presented to Dr. Gupta for neck pain, mid-thoracic back pain, hip pain, knee pain, and pain all over her body.  Tr. at 755.  Physical examination showed some tenderness with muscle spasm in the trapezius muscles, decreased range of motion in all directions, normal strength and reflexes, negative straight leg raising, tender greater trochanter and right knee, and painful muscles all over Plaintiff's body.  *Id*.  He diagnosed bilateral greater trochanter bursitis, cervical spondylosis, right knee osteoarthritis, and myofascial pain all over the body.  *Id*.  He prescribed Ultram, Soma and Trazadone.  *Id*.

On March 29, 2012, Plaintiff presented to Dr. Gupta at NeuroSpinecare, Inc. for her right knee pain.  Tr. at 753.  He noted that Plaintiff had no change, no muscle weakness, and no muscle spasm with regard to this pain and she had no muscle spasm or tenderness in her lumbar spine.  *Id*.  He found mild tenderness in the lower part of Plaintiff's cervical spine with normal strength and reflexes but mild pain with range of motion.  *Id.*  Straight leg raising was positive and she had tenderness in the right hip and knee.  *Id*.  He diagnosed right knee and hip osteoarthritis, bilateral greater trochanter bursitis, and cervical spondylosis.  *Id*.  He ordered a hip x-ray and prescribed Ultram, Soma and Trazadone.  *Id*.  The hip x-ray showed minimal hip and moderate sacroiliac joint osteoarthritic changes.  *Id*. at 763.

-13-

On March 30, 2012, Plaintiff had a brain MRI which showed nonspecific nonenhancing white matter foci which could not exclude a demyelinating process but for which clinical correlation was needed.  Tr. at 690.

On April 24, 2012, Plaintiff presented to Dr. Patel for her CTS, cervicalagia and fibromyalgia.  Tr. at 778.  He reviewed the results of the MRI and indicated that the results were not consistent with a multiple sclerosis ("MS") diagnosis.  *Id*.  He also noted that Plaintiff's rheumatoid factor, Vitamin D,and sed rate blood tests were normal.  *Id*.  He indicated that Plaintiff was severely depressed at her last visit and she reported severe stiffness in the morning and she was on the maximum doses of the medications prescribed.  *Id*. Physical examination showed normal strength in the extremities, and a normal gait and stance.  *Id*. at 779.  Dr. Patel diagnosed unspecified myalga and myositis and prescribed physical therapy and Savella.  *Id.* at 780.  He also noted his impression that Plaintiff had "fibromyalgia with cervicogenic pain and carpal tunnel syndrome."

On August 21, 2012, Plaintiff followed up with Dr. Patel for her fibromyalgia.  Tr. at 774.  She complained that she had to stop pool therapy because she would lose the use of her limbs after it was done and she was having problems writing, deep pain in her tendons, cramping feet and neck and back spasms.  *Id*. She also reported occasional slurred speech.  *Id.*  Upon examination, Dr. Patel found normal results, except for minor ataxia and hyperreflexia.  *Id*. at 776.  He diagnosed unspecified myalgia and myositis, ordered a cervical spine MRI, and prescribed a Lidoderm patch.  *Id.*  He also noted his impression that Plaintiff had "fibromyalgia with multiple other symptoms which I could not fit into any particular category."  *Id*.  He noted that Plaintiff had minor white matter changes in the brain, but he believed that they were mostly vascular spaces and not suggestive of demyelination as seen in MS.  *Id.*  He recommended further evaluation of Plaintiff's cervical spine to rule out MS, a disc problem, or a syrinx.  *Id.*

On October 19, 2012, Plaintiff presented to Dr. Patel for follow up of fibromyalgia and gait ataxia.  Tr. at 770.  Plaintiff reported feeling terrible and said that work and stress were affecting her walking and ability to write.  *Id*. She also reported left temple pain.  *Id.*  He noted that it was reported to him that she had no reflex in her lower extremities but he examined her and found that she had good reflexes.  *Id*.  He found normal reflexes and strength in her upper extremities and she

-14-

had a normal gait and stance and a normal sensory examination.  *Id.* at 772.  He found no muscle spasms or destonia and minor tenderness of the left temple.  *Id.*  He diagnosed unspecified myalgia and myositis and gait abnormality, ordered blood tests ,and prescribed Prednisone.  *Id*. His impression was also "fibromyalgia with multiple other symptoms which do not quite fit into one particular category."  *Id*.  He noted that he recommended a cervical spine MRI but the insurance company refused to pay for it.  *Id*.  He further noted that Plaintiff had minor white matter changes in the brain which did not suggest demyelination.  *Id.*

On December 31, 2012, Plaintiff had a MRI of the cervical spine which showed no disc herniation or significant bulging in the cervical spine and no canal or neural foraminal stenosis.  Tr. at 790.  However, evaluating the October 9, 2011 cervical CT scan with the MRI showed a small Schmorl's node to the left of midline within the superior endplate of the C6 vertebral body which was enhanced in the MRI.  *Id*.  It was suspected to represent an enlarging Schmorl's node with ongoing repair, but the possibility of an acute fracture or infection could not be ruled out and clinical correlation was recommended.  *Id*.

### 2.  Depression

On July 30, 2009, Plaintiff had a psychiatric evaluation at the Nord Center after being admitted to the Crisis Stabilization Unit and Partial Hospitalization Program at Nord on July 28, 2009. Tr. at 398-406.  Plaintiff had initially presented with increasing depression, weight loss, anxiety and stressors, and panic attacks.  *Id.* at 398.  Her prognosis was opined as good.  *I*d.

Dr. Hizon performed the psychiatric evaluation, noting that Plaintiff had been referred to Nord's Emergency Stabilization Services after her fiancé called Nord's Hotline reporting Plaintiff's depressive symptoms.  Tr. at 414.  Plaintiff explained that she had been going through relationship and financial problems and she was having trouble sleeping, increased anxiety, panic attacks, a twenty-pound weight loss, depressed mood, lack of concentration, forgetfulness, and loss of interest.  *Id*.  She reported drinking more wine than usual, and denied suicidal ideations or manic symptoms.  *Id*.  Dr. Hizon opined that Plaintiff appeared to still be functional as she reported good hygiene and grooming, cleaning her house and good parenting of her daughter.  *Id.*  He noted that although she denied suicidal ideations, she said that at times she wished that she would "die in a car wreck."  *Id.*

-15-

Plaintiff reported no prior psychiatric history and she noted a history of fibromyalgia for which she used to take Percocet, Morphine and Flexeril.  Tr. at 414.  She explained that she has not been able to afford medical care since March of 2009 because of a lack of health insurance.  *Id*.  She described her family history and placement in foster homes after her parents divorced and her father, with whom she had been living, died of leukemia when she was 12 years old.  *Id.*  She reported some abuse and delinquency during her teen years, but she earned her GED and had one year of college education.  *Id*. at 415.

Dr. Hizon noted upon examination that Plaintiff was calm and pleasant, with a depressed mood, a mobile and reactive affect, normal speech, and no flight of ideas or delusions or hallucinations.  Tr. at 415.  He found her concentration and attention-span to be fair, her short and long-term memory to be good, and she had good insight and fair judgment.  *Id*.  Dr. Hizon diagnosed adjustment disorder with mixed emotions with a rule out of major depressive disorder, bipolar disorder, and alcohol-induced mood disorder.  *Id*. at 416.  He also diagnosed a history of alcohol abuse with a rule out of alcohol dependence.  *Id*.  He rated her global assessment of functioning at 70 to 80, indicative of no more than a slight impairment of functioning.  *Id.*  Dr. Hizon prescribed Cymbalta, Vistaril and Trazodone.  *Id.*

On February 3, 2010, Licensed Independent Social Worker Budak,  a psychiatry specialist in the PsyComm Department of The MetroHealth System, conducted a community mental health assessment of Plaintiff.  Tr. at 589.  Plaintiff's chief complaint was depression and anxiety and she described many life situations that made her anxious, including ending a fifteen-year relationship with a boyfriend.  *Id*. at 589-590.  She noted her ten-day stay at Nord, which resulted in her ex-boyfriend and father of her daughter filing for emergency custody of their daughter because he reported that she was not stable.  *Id*. at 590.  She indicated that she thought it was best that her daughter reside with her father, but she felt guilty about not having her at home.  *Id*. She reported that she saw her daughter every weekend and visits most weekday evenings.  *Id*.  Plaintiff also indicated that she was dating a childhood friend but her ex-boyfriend would not allow him around their daughter because the friend had a charge of gross sexual imposition against a minor.  *Id*.  Plaintiff also discussed her car accident injuries, including her neck pain, and she reported that she

-16-

wished that she had died in the accident, although she would not try to hurt herself because of her daughter.  *Id.*

Upon examination, Ms. Budak indicated that Plaintiff was cooperative and anxious, oriented, had clear and normal speech, was logical and organized, had tight association, no abnormal thought processes, good insight and judgment, good recent and remote recall, sustained concentration and attention span, and had a depressed mood and congruent affect.  Tr. at 592.  She believed that Plaintiff had mood disorder not otherwise specified and she rated her GAF at 41-50, indicative of serious symptoms.  *Id.* at 593.

On February 9, 2010, Plaintiff met with Dr. Mendez for medication management and she reported that she felt depressed and was concerned about the custody of her daughter.  Tr. at 587.  She was tearful and anxious during the interview and reported neck pain at an 8 on a 10-point scale.  *Id.*  Dr. Mendez found that Plaintiff was oriented and had clear and normal speech, with tight association, no abnormal or psychotic thoughts, good insight and judgment, good recent and remote recall, sustained attention span and concentration, but depressed mood and congruent affect.  *Id.*  He diagnosed Plaintiff with depressive disorder, not elsewhere classified, and opined that Plaintiff was stable but depressed.  *Id.*

On March 3, 2010, Plaintiff presented to Dr. Draholusky-Dodig for phamacologic management and reported that she was still depressed and concerned about the custody of her daughter and was agitated by her limited visitation rights.  Tr. at 582.  Dr. Draholusky-Dodig noted Plaintiff's poor insight about the connection of her custody rights and her current relationship with a tier III sexual offender.  *Id.*  Plaintiff was tearful during the interview and was feeling very anxious with positive passive suicidal ideations that she wished that she had died in the car accident.  *Id.*  She requested Xanax and threatened to stop coming if she were not helped.  *Id.*  They discussed adjusting her Prozac and the importance of stopping the smoking of marijuana.  *Id.*  Dr. Draholusky-Dodig found Plaintiff calm and cooperative, oriented, with a logical thought process, tight association, no abnormal or psychotic thoughts, fair judgment and insight, good recent and remote recall, and sustained attention and concentration.  *Id.*  She diagnosed Plaintiff with depression not otherwise specified and unspecified episodic mood disorder and noted that Plaintiff was stable but

-17-

overwhelmed with psychosocial stressors. *Id.* at 583.  She increased Plaintiff's Prozac and kept her Vistaril, Vicodin and Flexeril the same. *Id.*

On March 29, 2010, LISW Budak noted a transfer of care for Plaintiff after she attended one session and it was determined that another part of the clinic was more appropriate for her treatment. Tr. at 521.  Her diagnosis of mood disorder, not otherwise specified, was noted as well as her GAF of 41-53 indicating serious symptoms. *Id.*

On June 19, 2010, agency reviewing psychologist Dr. Umana, Ph.D.  reviewed the record and completed a psychiatric review technique form ("PRTF") and a mental residual functional capacity form ("MRFCF"). Tr. 536-553. Dr. Umana reviewed Plaintiff's mental impairments under Listing 12.04 for affective disorders and Listing 12.09 for substance addiction disorders. *Id.* at 540-550.  She opined that Plaintiff's mental impairments caused mild restriction in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* at 550.  Dr. Umana opined that Plaintiff had the mental residual functional capacity ("MRFC") to perform moderately complex tasks with no strict time/production standards and occasional social contact. *Id.* at 538.

On October 11, 2011, Dr. Smith, Ph.D . performed a mental health evaluation for Plaintiff at the request of the agency.  Tr. at 668.  When asked why she was applying for disability benefits, Plaintiff reported that she had been diagnosed with fibromyalgia six years prior but then was in an automobile accident, lost her job and her car, and became depressed. *Id.*  She described her childhood as not very good because when her dad died when she was 12 years old, she went to live with her relatives who abused her. *Id.* at 669.  She was sent to a group home and obtained her GED and went to a trade school thereafter. *Id.*

When asked about prior mental health treatment, Plaintiff reported her stay at Nord Center in 2009 for a week after her ex-boyfriend abused her and she was given Cymbalta and treated for three months and then stopped going to treatment and taking the medication.  Tr. at 670.

At the evaluation, Dr. Smith found that Plaintiff showed appropriate affective expression and was tearful as she explained that she was still living with her abusive ex-boyfriend who continued to abuse her, but he was going to be incarcerated for wire fraud beginning in November and she

-18-

would stay in the house until he returned. Tr. at 671.  She indicated that she gets nervous and scared everyday when her ex-boyfriend is in the house and she worried about the future and how she would care for her and her daughter.  *Id*.  Dr. Smith observed that Plaintiff was alert and in good contact with reality, she was oriented, and she had good insight and fair judgment.  *Id*. at 672.

Dr. Smith diagnosed Plaintiff with adjustment disorder with anxiety and depressed mood and rated her GAF at 53, indicative of moderate symptoms.  Tr. at 675.  He opined that Plaintiff would be capable of  understanding, remembering and executing instructions, maintaining attention and concentration in a job, and in responding appropriately to supervision and to working with co-workers.  *Id*.  He also found that Plaintiff may have some problems dealing with work pressures in a job because of her depression and anxiety.  *Id*. at 673.

On October 16, 2010, Dr. Tishler, Ph.D. reviewed Plaintiff's medical records for the agency and affirmed Dr. Umana's PRTF as he found no worsening or additional treatment concerning Plaintiff's psychological condition.  Tr. at 615.

### **B.**     **Hearing testimony**

Plaintiff, who was forty-five years old at the time of the hearing, testified that she lived with her eight year old daughter and her ex-boyfried.  Tr. at 33.  She reported that she owned a car and drove short distances, such as taking her daughter to the bus stop each day and going to the grocery store two or three times per week.  *Id*. at 33-34.  She last worked in 2006 as the CEO of her own real estate company.  *Id*. at 35-36.

Plaintiff indicated that she saw Dr. Patel, her neurologist, once every month or every other month and she saw Dr. Gupta, a pain management specialist, once per month.  Tr. at 40.  She reported that she had pain in her skull from the open skull fracture, pain in her neck from two broken cervical vertebrae, two herniated cervical disks, and a polyp between two cervical disks.  *Id*. at 41.  She also reported hip, shoulder and hand pain and explained that she had arthritis in her hips, neck, and back, and a thirty percent loss of cartilage in her right hip and arthritis in her right knee.  *Id.*  She stated that she had been diagnosed with CTS which caused finger and wrist pain.  *Id.* at 44.  She reported that she dropped heavier objects often and had trouble writing due to the pain, but she could

pick up small objects like a coin or pencil.  *Id*. at 44-45.  Plaintiff also testified that she has had depression her whole life.  *Id.* at 62.

Plaintiff opined that she could stand in one place for about ten minutes, she could not walk more than one block, and she could sit no longer than ten minutes at a time.  Tr. at 56-58.  She reported that her hip pain prevented her from climbing a lot of steps, she could almost bend to touch the floor, she could lift a half gallon of milk with her left hand only, and she could lift up to five or ten pounds with her right hand.  *Id.* at 60.  She testified that she cleans the house and does the laundry and cooks, although not every day.  *Id*. at 66.  She goes to the grocery store, but her ex-boyfriend unloads the groceries for her.  *Id.*  She attends school functions with her daughter and tries to visit her neighbor everyday.  *Id*. at 67-68.

When asked why she stopped working in 2006, Plaintiff responded that she was raising her ex-husband's children, so she was a stay-at-home mother.  Tr. at 62.  She did state that she also had fibromyalgia at that time.  *Id*.

The ME then testified, summarizing Plaintiff's medical information beginning with her automobile accident in 2009 and progressing through the years.  Tr. at 73-75.  He noted that Plaintiff had serious neck problems, problems with her low back, both hips and at least one knee, and she had diffuse pain that has been called fibromyalgia or myofascial pain.  *Id*. at 75.  He explained that while tender points were found by doctors, none of them indicated whether she had met the requirements of the fibromyalgia tender points.  *Id*.  He indicated that the doctors had ruled out MS and she had a carotid duplex study that was normal.  *Id*. at 78.  He also identified Plaintiff's CTS.  *Id*. at 76.  He further reviewed her psychiatric history.  *Id.* at 76-78.

The ME opined that Plaintiff's impairments did not meet or equal any of the Listings.  Tr. at 79-80.  When the ALJ asked him his opinion of her exertional limitations, the ME indicated that it was hard to separate what Plaintiff was testifying to from what he saw in her medical record as she was stating that it was worse than what the record showed.  *Id*. at 80.  He opined that Plaintiff would be limited to sedentary work, with standing and walking at least two hours, lifting and carrying up to five pounds frequently and up to ten pounds occasionally, sitting six of eight hours, only occasional bending or climbing stairs, no climbing of ladders, and occasional crouching,

kneeling or crawling. *Id*. The ME further limited Plaintiff's right hand movements, first stating that she could not engage in rapid, repetitive movements of her right hand and could perform only occasional fingering and feeling on the right, but clarified that she had limited dexterity of the right hand and fingers due to moderate right CTS. *Id*. He further testified that:

> And limited, if it's even possible, discriminatory sensation, fine discriminatory sensation with the right hand and fingers; meaning she is going to drop things, some things occasionally at least, and that she would have some trouble doing anything dextrous with the right hand and certainly no rapid, repetitive movements.

*Id.* at 81. The ME further considered Plaintiff's non-exertional limitations and opined that she was limited to routine, low stress tasks without intense interpersonal aspects such as arbitration, negotiation, confrontation, not being responsible for the supervision or management of others or their health, safety or welfare, and no high or strict production quotas. *Id*. at 81-82.

Upon questioning from Plaintiff's counsel, the ME indicated that his limitations would have applied since 2009 when Plaintiff was in the automobile accident. Tr. at 83.

The ALJ then questioned the VE, presenting her with a hypothetical individual with the same age, education and background as Plaintiff that was impaired to the extent that Plaintiff had testified. Tr. at 85. The VE testified that no jobs would exist for a hypothetical individual who had the degree of impairment to which Plaintiff had testified. *Id*.

The ALJ presented a second hypothetical individual who had the same age, education and background as Plaintiff but who could also perform sedentary work with occasional bending and climbing of stairs, occasional crouching, crawling and kneeling, no climbing ladders, no rapid repetitive movements of the right hand, occasional fingers and feeling with the right hand, and limitations to no intense interpersonal interaction such as arbitration, negotiation, confrontation, supervision, confrontational work, not being responsible for the health, safety or welfare of others, and no high or strict production quotas. Tr. at 86. The VE responded that such a hypothetical person could not perform any work existing in significant numbers in the national economy. *Id.*

The ALJ presented a third hypothetical individual, removing the sedentary work restriction and adding a light work limitation with additional restrictions of no climbing of ladders, ropes or scaffolds, no being around unprotected heights, occasional stooping, kneeling and crouching, no crawling, jobs with no strict time or production standards, and only occasional social interaction

with others such as the public and co-workers.  Tr. at 87.  The VE indicated that a significant number of jobs existed in the national economy for such an individual, including a cleaner/housekeeper, mail clerk in a non-governmental setting, or a file clerk.  *Id*. at 87-88.

The ALJ presented a fourth hypothetical individual, keeping the same physical limitations as the third hypothetical individual, but adding limitations to routine, low stress work with no intense

interpersonal interaction such as arbitration, negotiation, confrontation, supervision, not being responsible for the health, safety or welfare of others, and no high or strict production quotas.  Tr. at 88.  The VE indicated that the jobs that she provided in response to the third hypothetical individual would not be eliminated by the additional restrictions that the ALJ presented in the fourth hypothetical individual.  *Id*.

## VI.    ANALYSIS

Plaintiff advances two arguments in this appeal.  She first contends that the ALJ erred in determining that her CTS was not severe at Step Two despite objective medical evidence demonstrating otherwise, including the testimony of the ME.  ECF Dkt. #15 at 2.  Second, Plaintiff contends that the ALJ erred when he incorporated only those limitations based upon her physical impairments and failed to include any limitations resulting from her depression.  *Id*.

### A.    Step Two Analysis and CTS

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a). The Regulations define basic work activities as being the " 'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug.27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

At step two, the term "significantly" is liberally construed in favor of the claimant.  The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle*" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).  Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987).  However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 416.920(d).

In the instant case, Plaintiff complains that the ALJ erred in not finding that her CTS constituted a severe impairment.  ECF Dkt. #15 at 9-13.  She asserts that the ALJ failed to adequately consider her CTS in his RFC and he erred by not adopting the ME's opinion concerning her CTS when it was supported by the medical records and her testimony.

Plaintiff is correct that the ALJ found at Step Two that her CTS was not a severe impairment. Tr. at 13.  However, the undersigned recommends that the Court find that this constitutes harmless error since the ALJ proceeded onward to Steps Three, Four and Five of the analysis and addressed Plaintiff's CTS and the reasons why he gave limited weight to the ME's opinion as to Plaintiff's CTS restrictions.  *Id.* at 14-16. The undersigned further recommends that the Court find that substantial evidence supports the ALJ's decision to give limited weight to the ME's opinion as to the restrictions arising from Plaintiff's CTS.

-23-

The ALJ explained why he gave only limited weight to the opinion of the ME as to the ME's opined limitations resulting from Plaintiff's right CTS.  Tr. at 19-20.  He first noted that at the hearing, the ME expressed his difficulty in separating the objective findings that he found in the medical record from the subjective complaints that Plaintiff was making at the hearing.  *Id*. at 19.  The ME did make such a statement, noting that "[s]he's [Plaintiff] stating it probably worse than the record does."  *Id*. at 80.  The ALJ also pointed out that the ME described Plaintiff' right CTS as "mild to moderate" on the right, while the EMG and nerve conduction studies found the right CTS to be mild only.  *Id*. at 20, 715.  The ALJ also noted that EMG and nerve conduction studies, as well as clinical examinations negated the ME's manipulative limitations for Plaintiff as they showed no strength, sensory or motor deficit in her upper extremities.  *Id*.  The medical record supports the ALJ's finding, as on June 23, 2010, Dr. Minwell, a neurosurgeon, found upon physical examination that Plaintiff's upper extremities had full strength and her hand intrinsics also showed full strength.  *Id.* at 564.  He further noted that Plaintiff's sensory examination and reflexes were also normal*. Id.*  Dr. Aguilera in the pain management clinic at The MetroHealth System also found on July 16, 2010 that Plaintiff had normal muscle strength and intact sensation in both upper extremities.  *Id*. at 558-560.  Dr. Parshotam Gupta of NeuroSpinecare, Inc. also found that Plaintiff had normal strength and reflexes in her upper extremities on May 25, 2011, June 7, 2011, June 20, 2011, July 27, 2011, August 29, 2011, October 9, 2011, November 22, 2011, February 3, 2012, February 29, 2012 and March 29, 2012.  *Id.* at 647, 649, 651, 653, 656, 691, 723-724, 753, 755, .  On October 11, 2011, Dr. Patel at the Neurology Center also noted normal upper extremity strength and Plaintiff's mild CTS on the right.  *Id.* at 781-782.  He further indicated that he did not agree with the amount of Soma that was being prescribed for Plaintiff.  *Id*. at 783.  He also noted Plaintiff's normal extremity strength upon examination on April 24, 2012, and on October 19, 2012 when Plaintiff was complaining that her ability to write was affected.  *Id*. at 772, 779.  Dr. Abraham at the Cleveland Clinic Pain Clinic also found on November 17, 2011 that Plaintiff had normal and symmetric bilateral upper extremity strength with no atrophy or bone abnormalities.  *Id*. at 683.

Based upon the record and the ALJ's decision, the undersigned recommends that the Court find that the ALJ applied the proper legal standard in considering Plaintiff's hand impairment and

the testimony of the ME and substantial evidence supports the ALJ's decision to grant limited weight to the ME's opinion as to this impairment and to not adop the ME's limitations resulting from Plaintiff's CTS.

     **B.**    **Mental RFC**

     Plaintiff also complains that Plaintiff failed to incorporate adequate work-related limitations into his mental RFC for her.  ECF Dkt. #15 at 15-19.  She asserts that while the ALJ adopted the ME's non-exertional limitations for her, the ME's non-exertional limitations were based upon her physical impairments and not her mental conditions.  *Id*. at 16-17.  She also contends that the ALJ erred by finding that she had moderate concentration problems but not accounting for this problem in his mental RFC for her.  *Id*. at 18.

     It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite her restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*.  The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

     In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations.  SSR 96-8p.  The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g.

-25-

daily activities, observations)." *Id.*  The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work. *Id.* However, "[ a]n ALJ need not discuss every piece of evidence in the record in order for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661,665 (6ᵗʰ Cir. 2004), unpublished.

Here, the ALJ included limitations in the RFC that Plaintiff could perform only routine, low-stress work without intense interpersonal interactions which was work not involving arbitration, confrontation, negotiation, supervision or others, being responsible for the health or safety of others, or high or strict production quotas.  Tr. at 16.

Plaintiff first complains that these limitations concern her physical problems and pain and have nothing to do with her psychiatric conditions.  ECF Dkt. #15 at 15.  She cites to the testimony of the ME in support of this assertion.  *Id.*  The ALJ's fourth hypothetical individual did mimic the limitations that the ME set forth in his testimony.  Tr. at 16, 81, 88.  And the ME's testimony does support a finding that the non-exertional limitations that he opined for Plaintiff stemmed from her physical impairments and not any mental impairment.  *Id.* at 81.  However, in addressing Plaintiff's mental conditions, the ME summarized Plaintiff's treatment for her mental health conditions, indicating:

> Exhibit 3F by Dr. Hyzon [phonetic] who diagnosed an adjustment disorder with mixed emotional features.  He noted the fibromyalgia which had already been diagnosed and chronic back pain.  However, he gave her a GAF of 70 to 80 which means he didn't think there was anything particularly wrong.  *I mean you know of no real severe impairment.*  At Metro Health Medical Center February 8ᵗʰ, 2010, exhibit 4F, the diagnosis was mood disorder not otherwise specified and she was given a GAF of 41 to 50, and that mood disorder was mostly depression.  Dr. Smith, a psychologist, evaluated her October 10ᵗʰ, 2011, exhibit 16F, noting she had 11ᵗʰ grade education, had the GED, diagnosed adjustment disorder with anxiety and depressed mood.  Gave her GAF of 53 and said she would have trouble with pressure that would be like trouble handling stress.

*Id*. at 77 (emphasis added).  After reviewing this evidence, the ME specifically stated: "So the record really doesn't emphasize mental and emotional psychiatric problems."  *Id.*  He then opined on exertional limitations for Plaintiff and identified his non-exertional limitations for her as "routine, low stress tasks without intense interpersonal aspects such as arbitration, negotiation, confrontation, not being responsible for the supervision or you know management of other people or the health

safety or welfare of other people, and no high or strict production quotas." *Id*. at 81.  The ME thereafter indicated that "[a]nd, of course, her physical therapist, and this is based on physical means not - - - this is not her psychiatric problem doing this, it's the physical problem, it's the pain." *Id.* This statement, coupled with the ME's statement that the record did not emphasize mental or psychiatric problems, supports a finding that the ME provided his non-exertional limitations for Plaintiff on the basis of her pain and not her psychological conditions.

The ALJ applied the same non-exertional limitations that the ME identified.  Tr. at 16. However, in determining to use these same non-exertional limitations for Plaintiff's mental RFC, the ALJ cited to and relied upon evidence in addition to the ME's testimony.  The ALJ afforded great weight to the opinions of two agency consulting psychologists, who opined that Plaintiff could perform moderately complex tasks without strict time or production standards and with only occasional social contact.  *Id*. at 18-19.  He also cited to Dr. Smith's findings that Plaintiff was capable of understanding, remembering and executing instructions, maintaining attention and concentration, responding appropriately to supervision and working appropriately with co-workers in a typical work setting, but she would have some problems dealing with work pressures.  *Id*. at 19. The ALJ's mental RFC of routine, low stress tasks without intense interpersonal supervision and no high or strict production quotas satisfies the findings of these agency psychologists who found that Plaintiff could perform in a typical work setting, with low stress and low work pressure, with occasional or normal interpersonal contact with others, and with no high or strict production quotas. The ALJ also cited to medical findings in the record indicating that Plaintiff had good recent and remote memory and sustained concentration and attention.  *Id*. at 17, citing Tr. at 466-467, 471, 477, 645, 647, 649, 753, 757, 761.  Thus, the undersigned recommends that the Court find that the ALJ applied the proper legal standards in determining Plaintiff's mental RFC and substantial evidence supports this determination.

Plaintiff also asserts that since the ALJ found that she had moderate limitations in maintaining concentration, persistence and pace, he failed to fully accommodate this finding because while he addressed the level of intensity of this limitation by restricting her to simple repetitive tasks,

-27-

he failed to address how often she would be unable to concentrate.  ECF Dkt. #15 at 17.  She thus asserts that remand is appropriate because the ALJ's hypothetical individuals to the VE failed to include this component of the moderate limitation in concentration, persistence and pace.  *Id.*

The ALJ did find at Step Three that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace.  Tr. at 15.  However this finding was made in addressing the Paragraph B criteria of the adult mental disorders Listings in Listing 12.00 and the ALJ noted that this determination at Step Three was not a RFC assessment but was used to rate the severity of the mental impairments at Steps Two and Three.  *Id.* at 16.  Further, the ALJ indicated in determining Plaintiff's mental RFC that he gave great weight to the opinions agency psychologists Drs. Tangeman and Rivera who reviewed the record at the initial and reconsideration levels and found that Plaintiff was moderately limited in maintaining concentration, persistence or pace, and accordingly limited Plaintiff to work involving moderately complex tasks with no strict time or production standards.  *Id.* at 18-19, citing Tr. at 111, 116, 125-127.  Plaintiff provides no support for a finding that the ALJ's mental RFC which included routine, low stress work with no high or strict production quotas, was not sufficient or was inconsistent with a moderate limitation in concentration, persistence or pace.  Moreover, the ALJ also afforded great weight to agency examining psychologist Dr. Smith's opinion.  *Id.* at 19.  Dr. Smith had opined that Plaintiff could maintain concentration, attention, persistence and pace in order to perform simple tasks and multi-steps tasks and she would have some difficulty in responding appropriately to work-related stress. *Id.* at 673-675.  The ALJ adequately accommodated this opinion as well by limiting Plaintiff to routine, low stress work with no high or strict production quotas.  *Id.* at 16.  Again, Plaintiff fails to show how or why this mental RFC does not adequately satisfy the opinions of the agency psychologists.

Upon review of the ALJ's decision and the evidence relied upon by the ALJ in determining Plaintiff's mental RFC, the undersigned recommends that the Court find that the ALJ applied the proper legal standards in determining Plaintiff's mental RFC and substantial evidence supports his mental RFC for Plaintiff.

**VII.** **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the

Commissioner's decision and DISMISS Plaintiff's complaint in its entirety with prejudice.


DATE: October 9, 2015

                                    ___/s/George J. Limbert_____
                                    GEORGE J. LIMBERT
                                    UNITED STATES MAGISTRATE JUDGE


        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure
to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's
recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981).